******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

PALMER, J., with whom ROGERS, C. J., and ZAREL-LA, J., join, dissenting. Under the emergency exception to the warrant requirement of the fourth amendment, the police may enter a dwelling without a warrant if they reasonably believe that an occupant is seriously injured or otherwise in immediate danger.[1] The present case implicates the commonsense requirement that, to meet this objective standard, before entering a dwelling to save or rescue an occupant, the police must take all reasonable measures, consistent with the exigencies of the situation, to ascertain whether a true emergency exists. Accordingly, if, in light of those exigencies, it is feasible for the police to attempt to contact the person whose safety is the subject of concern in order to determine whether that person actually is in the dwelling and, if so, in need of immediate aid, the police must make such an effort, and their failure to do so will render the search unlawful as incompatible with the reasonableness requirement of the fourth amendment to the United States constitution.[2] As the Appellate Court correctly concluded, that is exactly what happened in the present case: the undisputed evidence that the state itself adduced at the suppression hearing conclusively established that the police, in particular, Officer Tilford Cobb, had ready access to the cell phone number of the defendant, Michael Angelo DeMarco, which, as Cobb well knew, was contained in the defendant's file at the police department. See *State* v. *DeMarco*, 124 Conn. App. 438, 447–48 and n.5, 5 A.3d 527 (2010). Furthermore, that uncontested evidence demonstrated beyond a doubt that Cobb and his colleagues had more than ample opportunity to retrieve and call that number during the nearly one hour period that transpired from the time Cobb, followed by other officers, arrived at the defendant's home until the time they ultimately entered it. See id., 449. Finally, it also is undisputed that moments after the police concluded their search of the defendant's residence, they contacted the defendant on his cell phone, and he returned home immediately. Even though the state offered no reason or justification for the failure of the police to call the defendant in an effort to ascertain his whereabouts *before* searching his home for him, the trial court denied the defendant's motion to suppress, concluding that the state's evidence supported the inference, first, that the defendant's cell phone number was "not available" to the police—and, in particular, to Sergeant Thomas Barcello, the officer at the scene who, in consultation with Cobb and Patrol Officer Will Mercado, made the decision to enter the defendant's home—and, second, that, in any event, it was not necessary for the police to attempt to contact the defendant due to "the immediacy of the situation."

Because these findings are belied by the unchallenged testimony of the state's own witnesses, the Appellate Court, after conducting a thorough analysis of the trial court record in accord with well established principles of appellate review, properly concluded that the findings were clearly erroneous and, therefore, not sustainable on appeal. See *State* v. *DeMarco*, supra, 124 Conn. App. 448–50. Consequently, contrary to the determination of the majority—which refuses to apply the collective knowledge doctrine[3] and, instead, ignores the undisputed fact that Cobb easily could have contacted the defendant on his cell phone, thereby obviating any possible need to enter the defendant's home without a warrant—the state's claim under the emergency exception must be rejected because the police failed to take the steps necessary to establish the existence of a true emergency.[4] I therefore dissent.

I

FACTS

The majority recites the limited facts found by the trial court but omits most of the highly relevant, undisputed testimony, adduced by the state itself from the responding officers, that this court must consider in determining whether the trial court's findings are supported by the evidence. That uncontroverted testimony may be summarized as follows. On October 21, 2007, Cobb and his partner, Officer Jean Louis, were on patrol in the city of Stamford (city) when they decided to conduct an impromptu inspection of the defendant's home. Ten days earlier, in response to complaints about a horrible odor emanating from the defendant's home, Cobb had left a notice on the windshield of one of the defendant's vehicles asking him to contact the city's Animal Care and Control Shelter (animal control). Cobb could not recall, however, whether he had indicated on the form, by checking one of several boxes—licensing, complaints, vaccinations, and the like—what his visit had been about. Cobb also testified that the defendant's neighbors always were complaining about the horrible smell coming from the defendant's house. According to Cobb, the defendant complied with animal control on some matters but not on others, and "usually" responded to notices that were left at his house requesting that he call animal control. Because the defendant had not responded to the last notice, Cobb decided to conduct an unannounced follow-up visit on October 21, 2007. Unaware that Cobb would be visiting, the defendant had left his house earlier that morning to go to a local beach.

As the Appellate Court explained, "the record reveals that considerable time passed between Cobb's initial arrival at the scene and the warrantless entry by the fire department. Cobb testified that he had been at the defendant's home for several minutes when he decided

that something might be wrong inside the home and called the police dispatch number. Notably, Cobb did not call the emergency number. The dispatcher told Cobb that he would contact the sergeant who was on duty, and, within one-half hour, Barcello arrived at the defendant's residence. After Barcello spoke with Cobb, he went to the front door, walked around the exterior of the premises and attempted to look in the windows.

"At some point during Barcello's initial examination of the premises, Officer Mercado arrived, after being dispatched to assist Barcello. Mercado testified that he checked the front and back of the house and attempted to look in the windows. Mercado also testified that he spoke with Barcello and that they decided to call the [Stamford Fire Department (fire department)]. Barcello, whose testimony the [trial] court specifically credited, testified that between fifteen and twenty minutes [had] elapsed [from the time he arrived at the defendant's residence until he summoned the fire department]. When [the fire department arrived, the] firefighters put on their breathing apparatus and entered the dwelling." *State* v. *DeMarco*, supra, 124 Conn. App. 449.

With respect to whether the defendant's cell phone number was available to Barcello during that time, "Cobb testified that animal control possessed the defendant's cell phone number . . . . He also testified that he did not bring the number with him on the day of the warrantless entry but that the number was at the animal control office and that there were other animal control employees in the office on the date in question." (Footnote omitted.) Id., 447–48. When Cobb was asked why he did not call the defendant if he had been concerned about his welfare, he responded that he did not call the defendant because he did not have the defendant's cell phone number with him and that his primary concern was for the animals inside the defendant's home.[5] Cobb further testified that, after calling police dispatch, while waiting approximately thirty minutes for Barcello to arrive, he called Laurie Hollywood, his supervisor at animal control, and asked her to come to the scene to assist him in the seizure of the defendant's dogs, which she did. Cobb did not ask Hollywood to call the defendant, however, nor did he ask her to bring the defendant's cell phone number with her when she came.

When asked whether Barcello was aware prior to the search of the defendant's home that animal control had the defendant's contact information, Cobb responded that he believed Barcello was aware of this fact. Barcello's testimony, however, was somewhat vague and often conflicting as to when he actually obtained the defendant's cell phone number. Although he testified that he may have obtained the number prior to entering the defendant's home, he also stated that he never asked

anyone for the defendant's cell phone number prior to entering the home, and that he did not know whether anyone actually had tried to call the defendant. He conceded, however, that, as soon as the search concluded, one of the officers at the scene called the defendant on his cell phone and asked him to return home. Mercado, the officer who placed that call, testified that Barcello handed him the number after the search and told him to call the defendant. The defendant, who was approximately ten minutes away when he received Mercado's call, returned home immediately and was placed under arrest.

With respect to whether the immediacy of the situation prevented Barcello or any of the other officers from calling the defendant prior to entry, none of the officers testified that it would have been impracticable or difficult to do so. According to Mercado, the issue simply never was discussed. Indeed, although Barcello was the supervising officer, he testified that he did not know whether anyone had tried to call the defendant. Nevertheless, according to Barcello, he and the other officers at the scene conducted an investigation into the defendant's whereabouts prior to searching the defendant's home. With the exception of asking one of the defendant's neighbors whether he had seen the defendant "recently," however, Barcello could not identify any investigative efforts that he or the other officers had undertaken to ascertain the whereabouts of the defendant.[6] For example, it does not appear that he asked the defendant's neighbors how many cars the defendant owned and whether any of them were missing, whether they had seen the defendant in the ten days since Cobb had left the last notice, whether the defendant's house smelled any different than it usually smelled, or whether the accumulation of mail in the defendant's mailbox was unusual. In fact, while Cobb, Barcello and Mercado all cited the overflowing mailbox as one of the reasons why they thought the defendant might be in peril, there is nothing in the record to indicate that any of them examined the mail to determine how long it had been there.[7]

Finally, the undisputed evidence established that the conditions that the officers encountered at the defendant's home—barking dogs, horrible odor, multiple vehicles and unkempt premises—were not at all unusual for the defendant's residence, and the officers knew it. As the Appellate Court explained, "the uncontroverted evidence established that the police were aware on the day of their warrantless entry that the defendant's home was consistently in a state of disrepair and always had multiple cars parked on the premises, both in the driveway and on the front lawn." *State v. DeMarco*, supra, 124 Conn. App. 456–57 n.11. Furthermore, both Cobb and Hollywood testified that they were aware that the defendant owned several vehicles, and, according to Mercado and Barcello, there were only

two vehicles parked in front of the house when they arrived. As for the odor and the barking dogs, Cobb testified that the defendant's neighbors "were always complaining" about "a horrible smell coming from the house."

## II

### APPELLATE COURT DECISION

The Appellate Court concluded that the trial court's finding that the defendant's cell phone number was not available to Barcello was clearly erroneous in light of Cobb's uncontested testimony that animal control, which is a division of the Stamford Police Department, had the defendant's cell phone number. See *State* v. *DeMarco*, supra, 124 Conn. App. 447 and n.5. The Appellate Court reasoned that, although Barcello did not physically possess the defendant's number when he arrived at the defendant's residence, the only reasonable inference was "that Cobb could have readily obtained [it] by calling the animal control office."[8] Id., 448. In reaching its determination, the Appellate Court relied on the collective knowledge doctrine, pursuant to which a court considers the knowledge of all of the investigating officers, and not merely the personal knowledge of any single officer, in assessing the reasonableness of a warrantless search or seizure, if it is reasonable to do so. See id. In the view of the Appellate Court, therefore, because Cobb would have been expected either to obtain the defendant's cell phone number and to call the defendant himself, or to provide Barcello with that number, the police did not act reasonably in entering the defendant's residence without first trying to contact him. See id., 448–50.

The Appellate Court further concluded that the trial court's finding that the immediacy of the situation prevented Barcello from obtaining the number "was also clearly erroneous and [was] contradicted by the uncontested police testimony relating to the length of time that was spent at the [defendant's] residence before any authorities entered the dwelling." Id., 448. Specifically, the Appellate Court stated: "[T]he record clearly demonstrates that the authorities were at the defendant's home for nearly one hour prior to entering the dwelling. . . . [The events that took place during that time belie] any claim of emergency or imminent danger and the attendant implication that the police did not have adequate time to attempt to contact the defendant . . . before their warrantless entry of his home." Id., 453–54. The Appellate Court also observed that there were additional, uncontested facts in the record that bolstered the conclusion that an objectively reasonable officer would not have believed that the defendant's life was in immediate danger. Specifically, the Appellate Court concluded that "[t]he [trial] court's memorandum of decision properly sets forth many of the facts that were available to the police [when] they were deciding

to make a warrantless entry into the defendant's home. . . . [T]hey include the terrible odor, the overflowing mailbox and so forth. The [trial] court, however, only [set] forth the facts that tend[ed] to support the conclusion that an emergency situation [had] existed. There was, however, additional uncontroverted and unchallenged evidence presented at the suppression hearing that the court wholly disregarded in its findings." Id., 455.

The Appellate Court then summarized that evidence, which included that "Cobb and [Hollywood, Cobb's] supervisor . . . both testified without challenge that, over a period of years, the defendant's neighbors had often complained of the 'horrible smell coming from the house,' as well as dogs barking and roaming." Id., 455–56. The Appellate Court further observed that, although the trial court had relied on the number of vehicles in the defendant's front yard in concluding that it was reasonable for the officers to believe that the defendant was home, "the uncontroverted evidence [adduced at the suppression hearing] established that the police were aware on the day of their warrantless entry that the defendant's home was consistently in a state of disrepair and always had multiple cars parked on the premises, both in the driveway and on the front lawn." Id., 456–57 n.11. Specifically, the Appellate Court observed that Hollywood had testified, "without challenge, that she had been to the defendant's home three or four times, that she knew that he lived alone, that he owned three motor vehicles and a boat and that the property was generally in a state of disrepair." Id., 456.

### III

### MAJORITY OPINION

The majority commences its analysis by setting forth the proper standard of review "for deciding whether [a] trial court properly denied a defendant's motion to suppress on the ground that the search violated the fourth amendment to the United States constitution." As the majority states, when a defendant seeking to suppress evidence does not dispute the credibility or accuracy of the testimony of the state's witnesses, such that there is only one version of the relevant events on which the parties agree, the reviewing court must consider that uncontroverted evidence in evaluating a claim that the trial court's findings are clearly erroneous.[9] Because, as the majority concedes, the present case implicates this standard of review, this court, in reviewing the defendant's claim, must consider all of the evidence adduced by the state in determining whether the record supports the trial court's findings that the defendant's cell phone number was not available to the police and that the immediacy of the situation relieved them of any obligation that they otherwise might have had to contact the defendant.

The majority then addresses the merits of the state's claim that the Appellate Court incorrectly concluded that these two findings by the trial court were clearly erroneous. With respect to the finding that the defendant's cell phone number was not available to the police, the majority merely block quotes three pages of Barcello's vague and equivocal testimony, which was elicited on cross-examination, about what he recalled he may possibly have done on the day in question. Then, without any analysis or discussion of that testimony, and without any acknowledgment of the undisputed facts that undeniably support the contrary conclusion of the Appellate Court, the majority summarily asserts that, "[o]n the basis of the foregoing testimony, making every reasonable presumption in favor of the trial court's ruling as we are required to do, we conclude that there was sufficient evidence in the record to support the trial court's finding that the defendant's cell phone number was unavailable to Barcello at the scene." At no point does the majority even attempt to explain why Cobb, who concededly knew how to contact the defendant, was not under a duty to do so, or why, at the very least, Cobb was not obligated to inform Barcello that he could contact the defendant by calling his cell phone.

The majority determines that the evidence also justified the trial court's finding that the "immediacy of the situation" prevented Barcello from obtaining the defendant's cell phone number. In support of this conclusion, the majority refers to the evidence that the trial court relied on in concluding that the officers reasonably believed that an emergency existed, namely, the overflowing mail, the putrid smell, the dog feces on the floor, and the fact that, according to Barcello, he and his fellow officers conducted some sort of "preliminary investigation"—Barcello did not elaborate on the nature or extent of that investigation—to ascertain the defendant's whereabouts prior to entering his home. The majority, however, makes no mention of the fact that the officers were on the scene for nearly one hour before they entered the defendant's home, or that they were aware that the deplorable conditions were not unusual for the defendant's residence. Nevertheless, the majority states, without further explanation, that "[it] cannot conclude that the delays caused by the officers in investigating and then seeking backup and assistance from the [fire department] . . . negate the trial court's finding that the immediacy of the situation prevented Barcello from obtaining the defendant's cell phone number."

The majority further asserts that the Appellate Court improperly applied the collective knowledge doctrine, pursuant to which the knowledge of one investigating officer is imputed to the other investigating officers when it is reasonable to do so,[10] in concluding that the

trial court's finding that Barcello did not have access to the defendant's cell phone number was clearly erroneous. In reaching its determination, the majority asserts that it would be inappropriate to apply the collective knowledge doctrine in cases, like the present one, involving the emergency exception to the warrant requirement, because "[i]mposing [on] law enforcement officers who are responding to an emergency situation the obligation to contact the police station and [to] obtain information that may be contained in a police file . . . is not consistent with the purpose of the emergency exception." Text accompanying footnote 7 of the majority opinion; see also footnote 7 of the majority opinion ("[t]he legitimate reason not to apply the collective knowledge doctrine to a search like the one in the present case is that it takes away the ability of the police to act quickly in an emergency situation"). Finally, the majority concludes that the evidence, viewed in the light most favorable to sustaining the trial court's findings, was sufficient to support that court's determination that the police harbored an objectively reasonable belief that the defendant was inside his home and in need of emergency aid.

The majority's analysis is fundamentally flawed in a number of crucial respects. First, the majority refuses to apply the collective knowledge doctrine—specifically, it refuses to consider the fact that Cobb knew full well how to reach the defendant—without any legitimate reason for doing so. The majority's second, and most critical, impropriety, stems, in part, from its unwarranted failure to treat Cobb as an active participant in the events that culminated in the search. Notably, the majority cherry-picks evidence from the record and ignores certain other undisputed and highly relevant evidence, in particular, the fact that Cobb had easy access to the defendant's cell phone number and ample time to call the defendant's cell phone. As a result of these improprieties, the majority's evaluation of the evidence is hopelessly skewed. Finally, to buttress its ultimate determination that the police lawfully entered the defendant's home under the emergency doctrine, the majority relies on cases that have no bearing on the proper resolution of this case and disregards adverse case law that is squarely on point. I address each of these defects in turn.

A

I turn first to the majority's refusal to recognize the applicability of the collective knowledge doctrine because its refusal to do so renders invalid its conclusion that the defendant's cell phone number was not available to the police. Because Cobb was a sworn police officer who arrived at the scene first and remained there until the police entered the defendant's home approximately one hour later, the evidence establishing that he readily could have retrieved the defen-

dant's cell phone number and called him *must* be considered for purposes of determining whether the conduct of the police was reasonable under the circumstances. Common sense dictates this conclusion.

This court routinely applies the doctrine to analogous searches and seizures; e.g. *State* v. *Butler*, 296 Conn. 62, 72–73, 993 A.2d 970 (2010) (applying doctrine to reasonable suspicion determination); *State* v. *Batts*, 281 Conn. 682, 698, 916 A.2d 788 (applying doctrine to probable cause determination and review of trial court's denial of hearing under *Franks* v. *Delaware*, 438 U.S. 154, 98 S. Ct. 2674, 57 L. Ed. 2d 667 [1978]), cert. denied, 552 U.S. 1047, 128 S. Ct. 667, 169 L. Ed. 2d 524 (2007); and other jurisdictions have applied it to emergency searches. See, e.g., *United States* v. *Huffman*, 461 F.3d 777, 784–85 (6th Cir. 2006) (applying collective knowledge doctrine in assessing reasonableness of officers' belief that emergency existed inside home), cert. denied, 549 U.S. 1299, 127 S. Ct. 1863, 167 L. Ed. 2d 353 (2007); *United States* v. *Russell*, 436 F.3d 1086, 1094–95 (9th Cir. 2006) (Thomas, J., concurring in part and dissenting in part) ("[w]e analyze the 'reasonable grounds to believe that there is an emergency at hand,' on an objective basis, taking into consideration the collective knowledge of the officers at the time"); *Mitchell* v. *State*, 294 Ark. 264, 270, 742 S.W.2d 895 (1988) ("[r]egardless of what [the officer] personally knew, he is charged with the collective knowledge of the police department at the time [of the emergency search]"); *Oliver* v. *United States*, 656 A.2d 1159, 1166 and n.14 (D.C. 1995) (applying collective knowledge doctrine in assessing reasonableness of emergency search); *State* v. *Lemieux*, 726 N.W.2d 783, 789 (Minn. 2007) ("[w]hen assessing the reasonableness of an emergency-aid search, the officer who conducts the search is imputed with knowledge of all facts known by other officers involved in the investigation, as long as the officers have some degree of communication between them"). There simply is no legitimate reason not to apply the doctrine to warrantless searches, like the one in the present case, based on a purported emergency, because it is reasonable to expect investigating officers who are working together to share important information about their investigation, provided, of course, that it is feasible to do so under the circumstances. There is nothing in the record of the present case to suggest that it would not have been feasible either for Cobb to tell Barcello that he could obtain the defendant's cell phone number, or for Barcello to inquire of Cobb and his fellow officers whether they knew how to contact the defendant. Although Barcello might be excused for failing to ask Cobb whether Cobb knew how to reach the defendant— because Barcello reasonably would have expected Cobb, or any of the other officers on the scene, to alert him to the fact that the defendant's cell phone number was readily available—Cobb himself was required to

take the exceedingly simple investigative step of calling the defendant. Because Cobb was required to do so but did not, his failure to act necessarily is attributable to the police. The majority's contrary conclusion is simply indefensible.

The majority contends that the collective knowledge doctrine applies only to uphold emergency searches but not to invalidate them. In support of this assertion, the majority states: "It makes sense that we would want to support the community caretaking function of [the] police by allowing officers to communicate information that may alert one officer responding to a situation that there may be other factors that constitute an emergency that may not be apparent to the officer who responds. On the other hand, it would frustrate the purpose of the emergency doctrine to require officers who are first responders to a scene that reasonably appears to [involve] an emergency to contact the police department to see if there are facts known to other officers or in the department's files that negate what they see in person at the scene. Doing so may cause officers to lose valuable time." Footnote 7 of the majority opinion. In a similar vein, the majority states that "[i]mposing [on] law enforcement officers who are responding to an emergency situation the obligation to contact the police station and [to] obtain information that may be contained in a police file . . . is not consistent with the purpose of the emergency exception." Text accompanying footnote 7 of the majority opinion. The obvious defect in the majority's argument is that it begs the question: the argument *assumes* that an emergency exists. Of course, if the police confront a situation that causes them to reasonably believe that it is necessary to enter a dwelling or other property immediately to save life or limb, they have every right—in fact, they have an obligation—to do so, without conducting any additional investigation. In the present case, however, the police did not enter the defendant's residence immediately because, as they knew, they needed to ascertain additional facts to determine whether a true emergency existed. In such circumstances, if the police have ready access to the cell phone number of the person who is the object of their concern, attempting to contact that person would be among the very first things, if not *the* very first thing, that a reasonable police officer would do. That is especially true when, as in the present case, the police previously have contacted that person via cell phone in the past.

Although the collective knowledge doctrine typically has been applied for the benefit of the state,[11] there is, of course, no reason why it should not apply to the state's detriment when, as in the present case, an officer involved in an investigation possesses highly relevant information that bears directly on the necessity for a warrantless search but fails to share that information with his fellow officers. As one court has explained,

when one officer has information concerning the propriety of a warrantless search and "could have conveyed it to the searching officer in time . . . [that officer] has a duty to convey it . . . just as he would if he were seeking a warrant. Nor does that duty evaporate . . . if the search has already begun, though whether it has begun will often affect the feasibility of communicating the information in time to stop the search." (Citation omitted; emphasis omitted.) *United States* v. *West*, 321 F.3d 649, 651 (7th Cir.), cert. denied, 540 U.S. 946, 124 S. Ct. 385, 157 L. Ed. 2d 275 (2003); see also *United States* v. *Santa*, 180 F.3d 20, 28 (2d Cir.) (when facts known to some officers exonerated defendant, "the issue is whether the failure to communicate [the] facts to the arresting officer rendered the mistaken arrest unreasonable" [internal quotation marks omitted]), cert. denied, 528 U.S. 943, 120 S. Ct. 356, 145 L. Ed. 2d 278 (1999); *United States* v. *Valez*, 796 F.2d 24, 28 (2d Cir. 1986) (same), cert. denied, 479 U.S. 1067, 107 S. Ct. 957, 93 L. Ed. 2d 1005 (1987). The majority's contrary conclusion is predicated on the false premise that the police need not communicate with each other even when doing so is the only reasonable course of conduct. I know of no other legal rule or principle of general applicability that is so one-sided and so result driven.

Not surprisingly, the majority's determination that the collective knowledge doctrine may be applied only to uphold a warrantless emergency search and never to invalidate one will have truly bizarre and untenable consequences. For example, if one of several investigative officers actually knew or strongly suspected that the subject of the investigation was *not* in the dwelling to be searched, the entry into that dwelling nevertheless could be upheld under the emergency doctrine if that officer did not reveal that information to the officer responsible for making the decision to search the dwelling for the subject. In other words, under the majority's view, an emergency search of a residence would be deemed lawful even when one of the officers involved in the search was aware or reasonably believed, prior to the search, that the premises actually were unoccupied, but the officer simply opted not to share that knowledge or belief with the other officers. This cannot possibly be the law because such a patently absurd result cannot be countenanced. It also cannot be the law that Cobb's failure to alert his colleagues of the ready availability of the defendant's cell phone number somehow relieved the police of their duty to attempt to contact the defendant by calling his cell phone.

The majority also suggests that it is inappropriate to apply the collective knowledge doctrine in the present case because it would set a bad precedent for future cases. In support of this argument, the majority accuses the dissent of advocating a rule pursuant to which the police will be required to cull through department files and to poll all police personnel to determine whether

those sources might shed some light on the issue of whether an emergency exists. See footnote 7 of the majority opinion (asserting that it would be inconsistent with purpose of emergency doctrine to require police "to contact the police department to see if there are facts known to other officers or in the department's files that negate what they see in person at the scene" and that "[d]oing so may cause officers to lose valuable time"). In making this argument, the majority sets up the proverbial straw man. As the majority well knows, I do not contend that police officers responding to an emergency must contact the police department to see if there are facts known to other officers, or information contained in the department's files, that might contradict what they themselves observe at the scene. Of course, the collective knowledge doctrine imposes no such general or blanket obligation on the police. Whether an officer would be required to contact the police department—or to take any other action to rule out the possibility that there is no emergency—always will turn on whether an objectively reasonable officer would have taken such action in light of the facts known at the time of the perceived emergency. Obviously, no such communication can be expected if the need for swift action renders such communication impracticable or imprudent. But when they do have time to communicate the relevant information, there is no excuse for not doing so if the officer reasonably should know that sharing that information is necessary to the determination of whether a true emergency exists. That is precisely the scenario in the present case: a simple call to the defendant on his cell phone was an integral and necessary part of the investigation that the police undertook and deemed necessary to determine whether there was an emergency that would have justified the warrantless entry into the defendant's home.

Finally, it seems evident that the principles underlying the collective knowledge doctrine are inherent in the reasonableness requirement that governs the assessment of the constitutionality of any warrantless search, including a search under the emergency doctrine. The legality of any such search turns on a determination of whether an objectively reasonable, well trained officer would have believed that an emergency existed. See *State* v. *Fausel*, 295 Conn. 785, 795, 993 A.2d 455 (2010) ("[t]he test is not whether the officers [at the scene] actually believed that an emergency existed . . . but whether a reasonable officer would have believed that such an emergency existed" [internal quotation marks omitted]). Reasonableness in this context is assessed in light of the facts that were known to or reasonably discoverable by *all of the officers* involved in the search at the time of the perceived emergency. See, e.g., *United States* v. *Tibolt*, 72 F.3d 965, 969 (1st Cir. 1995) ("[t]he 'exigent circumstances' inquiry is limited to the objective facts reasonably

known to, *or discoverable by*, the officers at the time of the search" [emphasis added]), cert. denied, 518 U.S. 1020, 116 S. Ct. 2554, 135 L. Ed. 2d 1073 (1996). In the present case, there is no question that Cobb knew that the defendant's cell phone number was readily available, and, as I have explained, any reasonable officer in his position either would have contacted the defendant himself or informed Barcello that the defendant easily could be contacted.

B

Having determined that the majority improperly treats Cobb as if he were not a participant in the events that culminated in the warrantless search of the defendant's home, I next turn to the principal defect in the majority opinion, namely, the refusal of the majority to examine the trial court's key findings in light of certain uncontroverted and highly relevant facts. Specifically, the majority improperly upholds the trial court's findings that the defendant's cell phone number was unavailable to the police and, in any event, that there was insufficient time for the police to attempt to call the defendant, even though the undisputed facts inarguably contradict those findings.

With respect to the first such finding, it is undisputed, as I previously discussed, that Cobb, an animal control officer, readily could have retrieved the defendant's cell phone number because, as Cobb well knew, the number was on file at animal control. Because Cobb had access to the defendant's cell phone number, it is legally irrelevant that Barcello personally may have been unaware that the defendant could be reached by phone. Under the circumstances, Cobb himself was required to call the defendant. Thus, because Cobb knew how to reach the defendant, the state cannot claim that the police somehow were ignorant of that fact.

Contrary to the conclusion of the majority, the trial court's second critical finding, namely, that the immediacy of the situation prevented the officers from calling the defendant prior to the search, also was clearly erroneous. As the Appellate Court observed, and the state does not dispute, officers were at the defendant's home for almost one hour prior to entering it. See *State* v. *DeMarco*, supra, 124 Conn. App. 449. According to the testimony of those officers, Cobb spent the first thirty minutes making cell phone calls and waiting for Barcello to arrive. Cobb also called and spoke to animal control during this time frame, and he certainly could have obtained the defendant's cell phone number at that time. Thereafter, Barcello spent at least twenty minutes at the premises before the search commenced. In light of these undisputed facts, it defies credulity to conclude that there was inadequate time for Cobb, Barcello or Mercado to place a call to the defendant. To the contrary, there was plenty of time for them to do so; as Cobb testified, they simply neglected to do it.

Although the majority contends that the trial court's factual findings are supported by the record, what it really seems to be arguing is that the trial court's judgment can be sustained on the alternative ground that the officers' belief was objectively reasonable *despite their failure to call the defendant*. Thus, the majority states that it "decline[s] to apply the collective knowledge doctrine [in order] to conclude that the officers were required to obtain the defendant's cell phone number from animal control and [to] attempt to contact him prior to entering the home." Text accompanying footnote 9 of the majority opinion. The majority also argues that, "[a]lthough the dissent may not approve of the steps taken by the officers in the present case, it is not our role as an appellate court to dictate the appropriate steps and questions that police should use while investigating." Footnote 5 of the majority opinion. Although I agree, of course, that it is not our role to dictate the steps that the police must take in conducting an investigation, it most certainly *is* our role to evaluate the steps that *were taken* so that we may determine whether they gave rise to an objectively reasonable belief that an emergency existed. See, e.g., *Nelms* v. *Wellington Way Apartments, LLC*, 513 Fed. Appx. 541, 546 (6th Cir. 2013) ("each time [the] court has upheld a warrantless entry based [on] the emergency aid exception, credible and reliable evidence established the potential for injury to the officers or others and the need for swift action" [internal quotation marks omitted]); *LaLonde* v. *Riverside*, 204 F.3d 947, 957 (9th Cir. 2000) ("police [officers] can meet [their heavy] burden only by demonstrating specific and articulable facts [that] justify the finding of exigent circumstances" [internal quotation marks omitted]).

Although the majority asserts that the officers in the present case otherwise took appropriate steps and asked appropriate questions in the course of their investigation, it does not identify a single investigative step that would either excuse the officers' failure to call the defendant prior to entering his home or support an objectively reasonable belief that the defendant was inside his home in need of emergency assistance. Even if it is assumed that the police were actively investigating the defendant's whereabouts in the hour that transpired from the time Cobb arrived at the scene until the officers entered the defendant's home, an obvious first step in that investigation would have been to attempt to contact the defendant on his cell phone. Requiring evidence of such a call, or of some equivalent measure, is not Monday morning quarterbacking; it is, rather, an essential part of our responsibility as a reviewing court to ensure that the state has met its heavy burden of demonstrating that the warrantless search of the defendant's dwelling was constitutionally justified. See, e.g., *Hopkins* v. *Bonvicino*, 573 F.3d 752, 763 (9th Cir. 2009) (emergency exception to warrant

requirement is "narrow" and its boundaries must be "rigorously guarded" by courts "to prevent any expansion that would unduly interfere with the sanctity of the home" [internal quotation marks omitted]), cert. denied, 559 U.S. 1048, 130 S. Ct. 2342, 176 L. Ed. 2d 561 (2010). Notably, as I discuss more fully hereinafter; see part III C of this opinion; in contrast to other emergency doctrine cases, in the present case, there were no rapidly developing or emerging events occurring within the relevant time frame that made it impracticable for the police to place such a call to the defendant. To the contrary, for most of that time, the officers were waiting around for other officers and rescue personnel to arrive.

Finally, as the Appellate Court aptly noted, the unjustified failure of the police to attempt to contact the defendant before entering his home is compounded by the fact that virtually all of the conditions that the officers encountered there on the day in question—conditions that, according to the trial court, supported a reasonable belief that the defendant's life was in immediate danger inside the house, including barking dogs, multiple vehicles, a horrible odor, and unkempt premises—were not the least bit unusual for the defendant's property, and the officers were well aware of this fact when they made the decision to enter the defendant's home without a warrant. See *State* v. *DeMarco*, supra, 124 Conn. App. 455–56. It is axiomatic that when an officer knows or has reason to know that a particular condition is normal for a home, even if that condition would be extremely unusual for any other home, it never will be objectively reasonable for the officer to believe that the condition itself is indicative of an emergency inside the home.

In sum, the undisputed facts belie the state's claim, and the majority's conclusion, that it was not reasonably feasible, and therefore unnecessary, for the police to attempt to contact the defendant on his cell phone prior to entering his home. Because the defendant's cell phone number was readily available to the police and they had ample time to retrieve that number and call him, they were required to take that most modest and obvious investigative step. Moreover, there is nothing in the record to suggest that it would have been futile for the police to attempt to contact the defendant; on the contrary, they reached him on his cell phone immediately after concluding the warrantless search.[12] Consequently, their failure to call him rendered the warrantless search of the defendant's home unreasonable.

C

Finally, the sparse precedent on which the majority relies in support of its conclusion is inapposite to the issue presented. In particular, the majority identifies three cases that, it claims, buttress the conclusion that, as a matter of law, the officers in the present case were not obligated to secure the defendant's cell phone

number and to attempt to contact him prior to searching his home. None of these cases, however, bears any factual similarity to the present case, which likely explains why the majority does not discuss the facts of any of them. Indeed, one such case, *State* v. *Myers*, 601 P.2d 239 (Alaska 1979), does not even involve a search conducted pursuant to the emergency doctrine,[13] and another, *United States* v. *Wayne*, 318 F.2d 205, 207, 211 (D.C. Cir. 1963), cert. denied, 375 U.S. 860, 84 S. Ct. 125, 11 L. Ed. 2d 86 (1963), involved a paradigmatic emergency: the police forcibly entered and searched a locked apartment without a warrant after receiving a report that a dying or unconscious woman was being held inside. With respect to the third case, *Hunsberger* v. *Wood*, 570 F.3d 546 (4th Cir. 2009), cert. denied, 559 U.S. 938, 130 S. Ct. 1523, 176 L. Ed. 2d 113 (2010), the majority asserts that the "the Fourth Circuit Court of Appeals [in that case] rejected a similar claim," namely, that an officer should have obtained a homeowner's telephone number "and attempted to call him before entering [his home]."[14] Although one of the issues in *Hunsberger* was whether an emergency search of a residence was objectively reasonable in light of the failure of the police to call the homeowner prior to the search, that is the only similarity between that case and this case.

In *Hunsberger*, the police were called to the plaintiffs' residence by a neighbor who had observed strangers entering the residence at a time when she believed the plaintiffs were on vacation. See *Hunsberger* v. *Wood*, supra, 570 F.3d 549–50. When the police initially arrived, there were lights on inside the home and two cars parked in front of the home. Id., 549. Seeing nothing suspicious, the officers left. Id. Later in the evening, the police were summoned again to the plaintiffs' home by the same neighbor, who reported possible vandals or burglars inside the home. Id., 550. This time, when the police arrived, there were three cars parked in front of the residence, all of which were partially blocking the road. Id. The police also observed a young man enter the house through the garage. Id. "The officers decided to ask the occupants of the . . . home to move their cars and [to] avoid disturbing the neighbors. They each pulled their cars into the . . . home's driveway, at which point [the officers] noticed the lights inside the house turn off. [The officers] exited their vehicles, approached the house, and rang the . . . doorbell twenty-five or thirty times. No one came to the door." Id. "Walking back to their cars, the . . . officers noticed that the previously closed side door to the garage . . . . was now open." Id.

At this point, the officers' investigation began in earnest. As the Fourth Circuit explained: "It struck [the officers] as suspicious that the occupants of the home had turned off the lights when the officers approached, had refused to answer the door, and had apparently

fled the home. Given [the next-door neighbor's] claim that the [plaintiffs] might be out of town, [the officers] became concerned about the possibility of vandalism. [They] also took into consideration the fact that two weeks earlier a vacant house nearby had burned down as the apparent result of unauthorized use." Id. The officers therefore "decided to contact the [police] dispatcher to identify the owners of the vehicles in front of the house using the . . . license plate information. The dispatcher routed calls to each of the car owners [from the] cell phone [of one of the officers, who then] spoke to several parents including William Blessard . . . . Each agreed to pick up his or her respective vehicle." Id. "Blessard was the first parent to arrive. Blessard told [the officers] that [his stepdaughter, who had been driving his vehicle] was supposed to be sleeping over at a friend's house, and that he did not know why [his] car was at the home of the [plaintiffs], whom he did not know. Blessard called [his stepdaughter's cell phone] several times, but she did not answer. He became worried for the welfare of his stepdaughter." Id., 550–51.

"[The officers] suggested to Blessard that they see if anyone would come to the [plaintiffs' front] door if they rang the doorbell. Walking [toward] the front door, [the officers] passed the garage . . . [and] . . . heard something being knocked over. [The officers] stepped inside the garage and then heard the door that connected the garage to the house's basement shut and lock. Blessard followed [the officers] into the garage, walked down the steps to the basement door, knocked repeatedly, and shouted [his stepdaughter's] name. No one came to the door, and Blessard's apprehensions rose." Id., 551. One of the officers "then approached the door inside the garage that opened into the first floor of the home. He discovered it was unlocked. The series of strange happenings had increased [his] fears of vandalism as well as his concern for the welfare of Blessard's stepdaughter. At that point, [the officers] decided to enter the home." Id.

As the foregoing facts demonstrate, *Hunsberger* is readily distinguishable from the present case. In *Hunsberger*, the reasonableness of the warrantless search could be established on the basis of the investigative steps that the officers took, prior to entering the plaintiffs' home, to determine whether an emergency existed inside the home. These steps included, among other things, contacting the owners of all of the vehicles in front of the home to determine whether the vehicles were there for a reason. See id., 550. Moreover, unlike in the present case, the police in *Hunsberger* were responding to a neighbor's reports of suspicious activity inside or around the home, activity that the officers themselves had observed over the course of the evening, when the homeowners supposedly were out of town. See id., 549–51. The officers also were responding

to a stepfather's concerns about his missing stepdaughter, whom they had reason to believe was inside the plaintiffs' home but not responding to her cell phone. See id., 550–51.

In stark contrast to *Hunsberger*, the police in the present case had little or no cause to believe that the defendant was missing or otherwise in harm's way. Equally important, they made no effort to rule out the possibility that he was *not* seriously injured or in imminent danger, even though they had ample time and opportunity to do so. Although courts have upheld emergency searches in cases involving similar delays preceding a search, they have done so only when the evidence established that the officers used the time to actively investigate the surrounding circumstances to ascertain whether their concerns were well founded. See, e.g., *United States* v. *Jones*, 635 F.2d 1357, 1362 (8th Cir. 1980) ("[w]hen the police have a reasonable suspicion that someone is injured or that the public safety is in jeopardy, but refrain from taking immediate action in an effort to confirm or deny the suspicion, and then act once they have received no indication that the danger has been dissipated, the waiting period does not defeat the applicable exception to the warrant rule"); *United States* v. *Brandwein*, United States District Court, Docket No. 2:11-CR-04015-01/02-BCW (W.D. Mo. March 28, 2013) ("Both defendants have also asserted that there was not a true emergency . . . because there was a delay of approximately . . . [forty-five] minutes before the officers made the decision to unlock the door and search the home. The [c]ourt does not believe this is a persuasive argument. The record is clear that it took this amount of time for both [officers] . . . to conduct their preliminary investigation. The officers needed the time to assess the seriousness of the situation and [to] arrive at their determination that there was a very reasonable possibility that one or both of the residents of the home were likely inside and in need of assistance."); *Commonwealth* v. *Purnell*, Virginia Court of Appeals, Docket No. 1761-02-1 (Va. App. December 23, 2002) ("During the approximate two hour period before [the officers] entered the home, [they] were consistently and busily attempting to investigate the matter further and [to] determine a resolution to the problem. Neither the lapse of time . . . nor the investigation dissipated the potential urgency of the situation."). In marked contrast to these cases, the officers in the present case did virtually nothing that they reasonably would have been expected to do to determine whether the defendant was, in fact, at home and in need of emergency assistance. Most important, the officers failed to call the defendant— because they did not think to call him—even though they had access to his cell phone number and even though calling him would have been the most logical, investigative *first* step for the officers to have taken.

Moreover, as I previously noted, the fact that the officers called and reached the defendant on his cell phone immediately *after* the search makes it perfectly clear that they did not believe—because they had no reason to believe—that calling the defendant would be futile. Their failure to call him renders the search unreasonable because, in order to justify a search under the emergency doctrine, an officer "must have *valid reasons* for the belief that an emergency exists, *a* belief that must be grounded in empirical facts rather than subjective feelings . . . ." (Emphasis added; internal quotation marks omitted.) *State* v. *Fausel*, supra, 295 Conn. 795. Implicit in this standard is the requirement that the police take objectively reasonable steps under the circumstances to eliminate the likelihood that, in fact, there is no emergency. Cf. *Commonwealth* v. *Purnell*, supra, Virginia Court of Appeals, Docket No. 1761-02-1 (upholding emergency search of residence when, prior to entry, officers unsuccessfully tried to contact defendant by calling his home telephone and cell phone numbers). Thus, the Appellate Court correctly observed that the facts of the present case bear no likeness to the facts of those cases in which this and other courts have found warrantless searches to be justified under the emergency doctrine. See *State* v. *DeMarco*, supra, 124 Conn. App. 452–53. "The police did not respond to the defendant's home as a result of an alarm, there was no evidence that a violent criminal offender might be hiding in the house, no evidence of a break-in and no signs of a struggle or blood or any other indication of a potentially dangerous situation."[15] Id.; see also *United States* v. *Brandwein*, supra, United States District Court, Docket No. 2:11-CR-04015-01/02-BCW ("It is worth noting that all cases [in which] a court has found that an exigent circumstance existed appear to share two common factors. First, in all of the cases in which courts found exigency, officers observed events obviously occurring within the residence or building . . . [f]or example, cries for help, screams, loud noises, or an observation of a struggle or fight within the structure [that was visible] through a window. Second, courts have found exigent circumstances exist when officers observed events or evidence leading directly to a structure . . . [f]or example, a blood trail leading to a closed door.").

The trial court in the present case nevertheless concluded that an objectively reasonable officer would have believed that an emergency existed on the basis of the odor emanating from the house, the dilapidated condition of the premises, the accumulation of mail, the multiple vehicles on the front lawn, and the defendant's failure to respond to a note that Cobb had left ten days earlier. As the Appellate Court explained, however, none of these facts, either alone or in combination, justified an immediate search of the *defendant's* home because, as strange or abhorrent as these conditions

otherwise may have seemed, they were not unusual for the defendant's home. See *State* v. *DeMarco*, supra, 124 Conn. App. 455–56. Cobb and Hollywood both testified that animal control had been dealing with the odor problem *for years*, the house had been in a state of disrepair *for years*, the defendant had left multiple vehicles on his front lawn *for years*, and the defendant's dogs had been neglected *for years*. Cf. *United States* v. *Martinez*, 643 F.3d 1292, 1297 (10th Cir. 2011) ("Some households are tidy, others are not. A person's failure to keep an orderly home should not subject him or her to a warrantless search by police."); see also *State* v. *Geisler*, 222 Conn. 672, 687, 610 A.2d 1225 (1992) ("The poorest man may in his cottage bid defiance to all the forces of the crown. It may be frail; its roof may shake; the wind may blow through it; the storm may enter; the rain may enter; but the King of England cannot enter— all his force dares not cross the threshold of the ruined tenement!" [Internal quotation marks omitted.]).

Rather, the present case bears a striking resemblance to *State* v. *Vargas*, 213 N.J. 301, 63 A.3d 175 (2013), in which the New Jersey Supreme Court recently concluded on very similar facts that a search was not justified under the emergency exception to the warrant requirement. In that case, "a landlord called the police because he had not seen or been able to contact a tenant for two weeks. During the two-week period, the tenant's garbage was not placed curbside, his mail accumulated, his car remained unmoved, and his monthly rent went unpaid. The landlord expressed concern for the tenant's well-being, and the police entered the [tenant's residence] without a warrant and conducted a 'welfare check.' The tenant was not at home, but the search uncovered evidence that led to the tenant's indictment." Id., 305. "The trial court suppressed the evidence because the warrantless entry and search were not prompted by an objectively reasonable emergency. The Appellate Division [of the New Jersey Superior Court] reversed, concluding that the community-caretaking doctrine did not require an exigency to conduct a warrantless search; it only required that the police act reasonably." Id.

In reversing the judgment of the Appellate Division; id., 329; the New Jersey Supreme Court noted that the essential facts of the case were "basically undisputed." Id., 327. The tenant, who was generally reliable, had not responded to several cell phone voicemail messages regarding nonpayment of rent, his car had not been moved in several weeks, his mailbox was full and he had not taken out his trash. See id., 305, 307, 327. On the basis of this information, several officers entered the tenant's home to conduct a welfare check, without first attempting to contact him by phone. See id., 308, 327. In concluding that the conditions that the officers observed did not justify the warrantless search under the emergency exception to the warrant requirement,[16]

the New Jersey Supreme Court stated: "Whatever legitimate worries [the landlord] had about [his tenant's] welfare before dialing 9-1-1, he did not attempt to call [the tenant's] emergency contact number or place of business . . . [nor did he provide the police with the tenant's contact information so they could call him]. Indeed, [the landlord] did not know any of the personal details of the rhythms of [the tenant's] life, including whether and for how long he either vacationed, took business trips, or traveled to meet with family.

"In that regard, this is unlike the case of a close family member whose housebound elderly relative is not responding to telephone calls and knocks on the door. Nor is this like the case of a diabetic or infirm neighbor who is not seen carrying out routine daily activities and who is not answering the door or the telephone. We need not describe the myriad circumstances that might give rise to an objectively reasonable basis to believe that an emergency requires immediate action for the safety or welfare of another. Suffice it to say, those objectively reasonable circumstances were not found to be present here."[17] Id., 327.

The court in *Vargas* also emphasized that the person who had requested the police to check on the tenant, namely, the defendant's landlord, "did not live in the building where [the tenant] resided. The police officers who responded to his call learned only that [the tenant] had not been seen for two weeks and, during that time, [the tenant] had not picked up his mail, moved his car, or paid his rent and utility bills. [The landlord, however] could not convey anything about [the tenant's] routines, habits, or vulnerabilities. With this limited information, [the landlord] unlocked the apartment door, and the officers conducted a 'welfare check.' Although the police officers entered [the tenant's] residence without a warrant out of their expressed concern for the tenant's safety, the [s]tate concedes that neither the emergency-aid nor the exigent-circumstances exception to the warrant requirement justified the entry or search." Id., 327–28.

As in *Vargas*, whatever concerns Cobb or any of the other officers may have had about the defendant's welfare, they made no effort to contact him before entering his home, even though they had his contact information. According to Barcello, the search was conducted entirely on the basis of the information provided by Cobb. Like the landlord in *Vargas*, however, Cobb knew nothing about the details of the defendant's life. For example, he did not know whether the defendant was employed or unemployed, or whether he lived alone. He also did not know whether the defendant attended church, which could have explained where the defendant was when Cobb arrived unannounced at 11 a.m. on the Sunday morning in question. Apart from the fact that the defendant had more dogs than he could

care for and his house always smelled terrible as a result, the only other thing that Cobb believed he knew about the defendant was that he had not responded to a notice that Cobb had left ten days earlier on the windshield of one of the multiple vehicles that were typically parked on the defendant's front lawn.[18] Like *Vargas*, the present case lacks facts that would have led an objectively reasonable officer to deem it necessary to conduct an immediate search of the defendant's residence, at least without first trying to call the defendant and attempting to obtain relevant information about him from people who actually knew him and were familiar with his daily routine. Indeed, the majority has not identified a single case, and my research has not uncovered one, in which an emergency search was upheld under similar facts.

Instead, the majority relies on a handful of readily distinguishable cases in which a foul odor was found to have justified an emergency search of a residence. *United States* v. *Presler*, 610 F.2d 1206, 1209, 1211 (4th Cir. 1979); *People* v. *McGee*, 140 Ill. App. 3d 677, 678–79, 682, 489 N.E.2d 439 (1986); *People* v. *Molnar*, 288 App. Div. 2d 911, 911–12, 732 N.Y.S.2d 788 (2001), aff'd, 98 N.Y.2d 328, 774 N.E.2d 738, 746 N.Y.S.2d 673 (2002); *Rauscher* v. *State*, 129 S.W.3d 714, 717, 722 (Tex. App. 2004); *State* v. *York*, 159 Wis. 2d 215, 217–18, 223, 464 N.W.2d 36 (App. 1990), review denied, 465 N.W.2d 656 (Wis. 1991). In most of these cases, however, persons familiar with the residence or the landlord or owner had reported the odor as something entirely out of the ordinary and of grave concern because the resident had not been seen in several days. See, e.g., *United States* v. *Presler*, supra, 1209; *State* v. *York*, supra, 217–18. In one of these cases, the investigating officer smelled what he believed to be a dead body. *People* v. *McGee*, supra, 679. In the present case, by contrast, no one had reported the defendant missing, and the odor emanating from his home was not at all out of the ordinary. In fact, on the day in question, Cobb was following up on a prior foul odor complaint, one of many that his office had received over the years. Thus, the result that the majority reaches finds no support in the case law involving the emergency exception to the warrant requirement. On the contrary, that precedent dictates the opposite result.

## IV

## CONCLUSION

It is a "basic principle of [f]ourth [a]mendment law that searches and seizures inside a home without a warrant are presumptively unreasonable . . . ." (Internal quotation marks omitted.) *Groh* v. *Ramirez*, 540 U.S. 551, 559, 124 S. Ct. 1284, 157 L. Ed. 2d 1068 (2004). Moreover, "[t]he [f]ourth [a]mendment's requirements regarding search warrants are not formalities. . . . By requiring police officers first to obtain a warrant before

they search a person's home, unless some exception applies that permits a warrantless search, the [f]ourth [a]mendment has interposed a magistrate between the citizen and the police, not to shield criminals nor to make the home a safe haven for illegal activities, but rather to ensure that an objective mind might weigh the need to invade that privacy in order to enforce the law." (Citation omitted; internal quotation marks omitted.) *United States* v. *Voustianiouk*, 685 F.3d 206, 210–11 (2d Cir. 2012), quoting *McDonald* v. *United States*, 335 U.S. 451, 455, 69 S. Ct. 191, 93 L. Ed. 153 (1948). Indeed, "physical entry of the home is the chief evil against which the wording of the [f]ourth [a]mendment is directed." (Internal quotation marks omitted.) *Payton* v. *New York*, 445 U.S. 573, 585, 100 S. Ct. 1371, 63 L. Ed. 2d 639 (1980). "Searches conducted pursuant to emergency circumstances are one of the recognized exceptions to the warrant requirement under both the federal and state constitutions." (Internal quotation marks omitted.) *State* v. *Fausel*, supra, 295 Conn. 794. "The emergency exception to the warrant requirement allows police to enter a home without a warrant when they have an objectively reasonable basis for believing that an occupant is seriously injured or imminently threatened with such injury. . . . Nevertheless, the emergency doctrine does not give the state an unrestricted invitation to enter the home. [G]iven the rationale for this very limited exception, the state actors making the search must have reason to believe that life or limb is in immediate jeopardy and that the intrusion is reasonably necessary to alleviate the threat. . . . The police, in order to avail themselves of this exception, must have valid reasons for the belief that an emergency exists, a belief that must be grounded in empirical facts rather than subjective feelings . . . . It is an objective and not a subjective test. The test is not whether the officers actually believed that an emergency existed . . . but whether a reasonable officer would have believed that such an emergency existed. . . . The state bears the burden of demonstrating that a warrantless entry falls within the emergency exception." (Citations omitted; internal quotation marks omitted.) Id., 794–95.

In the present case, the state has failed to meet its burden of demonstrating that the warrantless search of the defendant's home was objectively reasonable in light of the facts that were known to or readily discoverable by the officers who conducted the search. In particular, the state has made no effort to justify the officers' failure to attempt to call the defendant even though they knew that the smell, the vehicles on the front lawn and the otherwise unkempt condition of the premises were hardly unusual. It therefore requires no second guessing of the trial court or the officers on the ground to conclude that the warrantless search in the present case was objectively unreasonable in view of

the officers' failure to make any effort to reach the defendant on his cell phone, a call that would have obviated any possible concern about the perceived need for the warrantless intrusion into the defendant's home. On the contrary, even the most deferential review of the trial court's fact-finding leads inexorably to this conclusion. I therefore dissent.

[1] Of course, "the emergency doctrine does not give the state an unrestricted invitation to enter the home. [G]iven the rationale for this very limited exception, the state actors making the search must have reason to believe that life or limb is in immediate jeopardy and that the intrusion is reasonably necessary to alleviate the threat. . . . The police, in order to avail themselves of this exception, must have valid reasons for the belief that an emergency exists, a belief that must be grounded in empirical facts rather than subjective feelings . . . . It is an objective and not a subjective test. The test is not whether the officers actually believed that an emergency existed . . . but whether a reasonable officer would have believed that such an emergency existed." (Citations omitted; footnote omitted; internal quotation marks omitted.) *State* v. *Geisler*, 222 Conn. 672, 691–92, 610 A.2d 1225 (1992).

[2] In a given case, the state might be able to establish that it would have been futile, and therefore unnecessary, for the police to have tried to contact the person who is feared to be in danger inside the dwelling, even if they had time to do so. That, however, is not the case here, and the state makes no such claim. Indeed, it is undisputed that the police did, in fact, reach the defendant via cell phone immediately after completing the search of his home, at which time the defendant promptly returned home.

[3] Under the collective knowledge doctrine applicable to police investigations, the knowledge of any one investigative officer is imputed to the other officers involved in the investigation. Although we sometimes have described the doctrine in somewhat broader terms; see, e.g., *State* v. *Butler*, 296 Conn. 62, 72, 993 A.2d 970 (2010) ("in testing the amount of evidence that supports probable cause, it is not the personal knowledge of the arresting officer . . . but the collective knowledge of the law enforcement organization at the time of the arrest that must be considered" [internal quotation marks omitted]); for present purposes, its applicability may be limited to circumstances such as those in the present case, in which there is active communication between the officers involved in the investigation.

[4] For the reasons set forth in this opinion, I also agree with the Appellate Court that the factual scenario with which the police were confronted in the present case simply does not rise to the level of an emergency that would justify a warrantless entry into the defendant's home. See *State* v. *DeMarco*, supra, 124 Conn. App. 450–51. Indeed, on the present record, I do not believe that the state has established that the police would have been justified in entering the defendant's home without a warrant when they did, even if they had tried and failed to contact the defendant. The failure of the police to take that threshold investigative step, however, clearly is fatal to the state's claim under the emergency doctrine. I therefore focus on that issue.

[5] Cobb testified that, as he approached the house on foot, he smelled a horrible odor that he thought was from dog feces. When he knocked on the door, the door opened, and he could see feces all over the floor. He also smelled the strong stench of ammonia. When the door opened, one dog ran toward him, so he closed the door quickly. He also could hear other dogs barking inside the house.

[6] One neighbor responded that he had not seen him recently.

[7] The record reveals that the mailbox in question was approximately five by fifteen inches and was attached to the house. According to Cobb, although he did not actually examine any of the mail, some of it "looked like it had been there several days. . . . [There] was like a grocery store flyer, something like that, and there were other items in the mailbox at that time."

[8] The Appellate Court explained: "Cobb knew about the number, [animal control] was in possession of the number, and, accordingly, [the court] conclude[s] that the finding by the court that Barcello did not have the defendant's cell phone number available to him while he was at the defendant's residence and before he decided to order the warrantless entry was clearly erroneous." *State* v. *DeMarco*, supra, 124 Conn. App. 448.

[9] More specifically, the majority states: "[I]f, upon examination of the testimonial record, the reviewing court discovers but one version of the

relevant events [on] which both the state and the defendant agree, and such agreement exists both at trial and on appeal, the reviewing court may rely on that version of events in evaluating the propriety of the trial court's determinations and [in] determining whether the trial court's factual findings are supported by substantial evidence. In a case [in which] the trial court has concluded that the police action at issue was justified and the undisputed version of events reflected in the transcript was adduced by the state through [the] testimony of the police officers who were involved, a reviewing court's reliance on that version of [the] events is particularly appropriate. If the officers' own testimony as to what occurred is internally consistent and uncontested by the defendant but, in fact, undercuts the trial court's ruling in favor of the state, a reviewing court would be remiss in failing to consider it." Text accompanying footnote 4 of the majority opinion. The majority acknowledges that these requirements are satisfied in the present case.

[10] See footnote 3 of this opinion.

[11] Ordinarily, the collective knowledge doctrine is applied to defeat a challenge to the legality of an arrest or detention on the ground that the individual police officer responsible for arresting or detaining the defendant personally did not have probable cause or reasonable suspicion to do so. Under the doctrine, an arrest or detention is not unlawful, even if the arresting or detaining officer himself lacked probable cause or reasonable suspicion, as long as other participating officers were aware of facts sufficient to satisfy the requisite standard.

[12] The majority criticizes me for observing that the police reached the defendant on his cell phone immediately after completing their search of his home. See footnote 11 of the majority opinion ("We note that the dissent bolsters its argument with reference to the amount of time it took to notify the defendant that the police were looking for him, and, thereafter, how long it took [for] him to appear at his house. We evaluate the situation, as the trial court did, at the time the police entered the house, based [on] the totality of the circumstances at that time in order to make a determination [of whether] a police officer reasonably would have believed that an emergency existed. A resort to circumstances that occurred subsequent to that time would not be prudent and would distort the analysis."); see also *State* v. *DeMarco*, supra, 124 Conn. App. 471 (*Beach, J.*, dissenting) ("[alt]hough the defendant perhaps could have been called prior to the entry, he was not called, and we ought not speculate about the result of a call not made"). It cannot reasonably be argued that the police can fail to take a required investigative step—a step that is necessary to safeguard the defendant's constitutional rights—and then be relieved of responsibility for failing to take that required action on the ground that we cannot know for certain that the action would have been successful. In such circumstances, the burden should be on the state to demonstrate why the required action likely would not have achieved its intended result. In any event, in the present case, the police called the defendant on his cell phone promptly after they searched his home, and he answered that call. Because there is no reason to believe that the defendant would not have answered his cell phone if the police had called him a few minutes earlier, before they searched his home, the record establishes beyond any reasonable doubt that a timely call to the defendant would not have gone unheeded. Moreover, in view of the fact that the police themselves bear responsibility for failing to call the defendant when they should have called him, the majority cannot reasonably preclude consideration of the only evidence on that issue and then maintain that there is nothing in the record to indicate that the defendant would have answered the call if it *had been* made.

[13] In *Myers*, the police entered and briefly searched a commercial establishment upon finding a door wide open in the middle of the night. *State* v. *Myers*, supra, 601 P.2d 240. After observing that "the fourth amendment neither compels us to ignore the profound differences distinguishing one's home from one's business, nor compels us to presume that people desire or expect the police to conduct themselves in identical fashion with respect to each"; id., 242–43; the Alaska Supreme Court concluded that a routine business security check such as the one that occurred in that case was per se reasonable under the United States and Alaska constitutions. See id., 241–42, 244.

[14] *Hunsberger* is a civil case in which the plaintiffs were seeking damages for the allegedly unlawful search of their home. See *Hunsberger* v. *Wood*, supra, 570 F.3d 549.

[15] The majority takes issue with the Appellate Court's observation that the present case bears none of the features of a typical emergency exception case; *State* v. *DeMarco*, supra, 124 Conn. App. 452; stating that "this court has repeatedly recognized that [d]irect evidence of an emergency is not

required because the emergency exception to the warrant requirement arises out of the caretaking function of the police." (Internal quotation marks omitted.) Footnote 10 of the majority opinion, quoting *State* v. *Fausel*, supra, 295 Conn. 800. The majority's assertion misses the point. In explaining that the present case bears no resemblance to the typical emergency exception case, which normally involves cries for help, gunshots, fire, threats to human life, or reports of a missing person, the Appellate Court was simply and correctly pointing out that the state, in order to meet its burden in the present case, was required to demonstrate that, during the hour leading up to the warrantless entry, the police took appropriate steps to determine whether a true emergency existed.

[16] In *Vargas*, the New Jersey Supreme Court rejected the conclusion of the Appellate Division that a warrantless search under the community-caretaking doctrine did not require exigent or emergency circumstances; see *State* v. *Vargas*, supra, 213 N.J. 328; and addressed the issue of whether there were sufficiently exigent circumstances in that case to justify the warrantless entry into the tenant's residence. See id., 327, 329. In *Vargas*, the state of New Jersey actually conceded that the facts did not support an emergency search; id., 328; and the Supreme Court of New Jersey agreed with that concession. See id., 329.

[17] Notwithstanding marked similarities between *Vargas* and the present case, the majority argues that my reliance on *Vargas* is misplaced because, in that case, the state of New Jersey conceded that the facts did not support the application of the emergency exception. See footnote 10 of the majority opinion; see also *State* v. *Vargas*, supra, 213 N.J. 328. The majority asserts that, "[o]n the basis of the state's concession in *Vargas*, the New Jersey Supreme Court's analysis in that case is of little use in the present case [in which] the precise issue is whether . . . the facts permit the invocation of the exigent circumstances exception to the warrant requirement." Footnote 10 of the majority opinion. The majority, however, fails to explain *why Vargas* is of "little use . . . ." Id. Certainly, it is of little use to the majority because, on virtually identical facts, the Supreme Court of New Jersey reached a conclusion that is diametrically opposed to the conclusion that the majority reaches in the present case. Contrary to the majority's assertions, however, the court in *Vargas* did not simply reject the state's claim that the community-caretaking doctrine did not require proof that the officers had an objectively reasonable belief that an emergency existed. Indeed, in marked contrast to the analysis of the majority in the present case, the court in *Vargas* painstakingly applied the correct legal standard to the operative facts, explaining in detail why those facts did not support an objectively reasonable belief that an emergency existed. See *State* v. *Vargas*, supra, 213 N.J. 328–29. The state's concession in *Vargas* that the court was correct in its analysis of the facts in no way detracts from that analysis.

[18] The majority underscores Cobb's testimony that the defendant was usually pretty prompt about responding to such notices as supporting an objectively reasonable belief that an emergency existed inside the defendant's home. Specifically, the majority asserts: "Under the facts of the present case . . . although entry was not possible immediately, it is clear that animal control had a history with the defendant and that typically the defendant responded to notices left by animal control. The fact that the defendant called animal control, unbeknownst to Cobb, the day after the first notice was left, demonstrates that Cobb's view of the defendant's conduct was correct. Therefore, the fact that the notices, which were left approximately ten days before, were still outside and seemingly ignored made it more likely that an emergency existed inside the home." Footnote 8 of the majority opinion. Although the defendant's seeming failure to respond to Cobb's notice may have been grounds *to commence* an investigation, it hardly supported an objectively reasonable belief that it was necessary to conduct an immediate search of the defendant's home without a warrant. Indeed, Cobb testified that he could not recall whether he even had indicated on the notice form, by checking a designated box, what his visit had been about or why the defendant needed to contact animal control. I note, moreover, that, if Cobb and his fellow officers had taken even the most basic investigative steps to determine whether an emergency existed, they likely would have learned, as the majority itself notes, *that the defendant had in fact been in touch with animal control shortly after Cobb's prior visit.* Of course, this knowledge alone would have obviated any possible rationale for a search under the emergency exception to the warrant requirement.